IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 24, 2011 Session

## LYDIA LEE OGLE v. KEVIN FRANK OGLE

**Appeal from the Circuit Court for Warren County**
No. 3336      Larry B. Stanley, Jr., Judge

No. M2010-02556-COA-R3-CV - Filed November 16, 2011

In a divorce action, Husband appeals the trial court's designation of Wife as the primary residential parent, its allocation of the marital debt, and its denial of alimony. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Kevin Frank Ogle.

Gregory M. O'Neal, Winchester, Tennessee, for the appellee, Lydia Lee Ogle.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Lydia Lee Ogle ("Wife") and Kevin Frank Ogle ("Husband") were married in 1995 and have two minor children, Blaine and Blake. Wife filed for divorce and the matter was heard on March 9 and March 11, 2010. Several people testified, including Husband, Wife, Blaine (age 13), Blaine's counselor, Wife's mother, and Husband's sister, father, and mother. In a final decree and order entered March 25, 2010, the trial court granted the parties a divorce on stipulated grounds in accordance with Tenn. Code Ann. § 36-4-129, ordered the marital home sold at public auction, and named Wife the primary residential parent of the children. Through the parenting plan, the court ordered that Wife and Husband would spend 265 and 100 days per year with the children, respectively, and granted Husband parenting time on alternating weekends, alternating Wednesday evenings during the school year, and

alternating summer weeks. Finding that Wife's gross monthly income was $3,595.92 and Husband's was $1,125.00,[1] the court ordered Husband to pay child support of $181.00 monthly. The trial court did not award alimony to either party.

On October 19, 2010, Husband filed an amended petition for contempt alleging, among other things, that Wife had intentionally violated the parenting plan by deferring to Blaine's refusal to have overnight visitation with his father. Wife's response to the petition admitted that Blaine had refused to go with his father on a particular visit but denied that she had refused to require him to do so. A final hearing was held on October 29, 2010, and on November 3, 2010, the court issued its order dividing the parties' personal property and remaining debt and dividing equally between them the amount still due on the marital home. In addition, the court found that no legal debt was owed to Husband's father and denied Husband's request for alimony, finding no basis for an award under Tenn. Code Ann. § 36-5-121. As to Husband's petition for contempt, the court found "that [Wife] did not willfully commit contempt of court" and that "[s]he has attempted to follow the parenting plan by getting [Blaine] to visit with his father." The court noted that Blaine "has a legitimate deep-seeded fear of visiting with [Husband] regardless of whether there is a legitimate reason for this fear."

Husband appeals on the issues of the trial court's allocation of the marital debt,[2] its designation of Wife as the primary residential parent, and its denial of Husband's request for alimony.

STANDARD OF REVIEW

Our review of the trial court's findings of fact is de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). When the trial court makes no specific findings of fact, however, we must review the record to determine where the preponderance of the evidence lies. *Kendrick v. Shoemake,* 90 S.W.3d 566, 570 (Tenn. 2002). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

Because "'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge,'" we review issues of parenting time and primary residential parent status for abuse of discretion. *Eldridge v. Eldridge,* 42 S.W.3d 82, 85

---

[1] Husband's income is limited to social security disability, which he has received since 1998.

[2] Namely, Husband appeals the trial court's declining to classify as marital debt any money allegedly owed by Husband and Wife to Husband's father.

(Tenn. 2001) (*quoting Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1998)). "[A]ppellate courts will decline to disturb a parenting plan fashioned by a trial court unless that decision is based on application of an incorrect legal standard, is against logic or reasoning, or is not supported by a preponderance of the evidence." *Cummings v. Cummings,* No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004).

A trial court has broad discretion to determine the need for spousal support, as well as the appropriate nature, amount, and duration of that support. Tenn. Code Ann. § 36-5-121; *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004). "As a general matter, we are disinclined to alter a trial court's spousal support decision unless the court manifestly abused its discretion." *Goodman v. Goodman,* 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999).

Under the abuse of discretion standard, a reviewing court cannot substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). Rather, a reviewing court will find an abuse of discretion only if the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.,* 249 S.W.3d 346, 358 (Tenn. 2008); *see also Lee Med., Inc. v. Beecher,* 312 S.W.3d 515, 524 (Tenn. 2010). Therefore, "when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Gonsewski v. Gonsewski*, No. M2009-00894-SC-R11-CV, 2011 WL 4116654, at *3, __ S.W.3d __ (Tenn. Sept. 16, 2011).

ANALYSIS

I.

The trial court found that there was no legal debt due to Husband's father. Husband concedes that no legal debt was due to his father but argues that the amount owed was a marital debt subject to division because it was incurred for Husband and Wife's benefit during the course of the marriage.

At trial, Husband testified that throughout the marriage, he and Wife borrowed "[o]ver $41,000" from Husband's father. Wife testified that Husband's parents "gave money during our marriage as gifts," and further testified as follows:

Q. So, the 45-, $48,000 that [Husband's father] says that he's advanced you folks during the past 15 years, you just say you don't know the first thing about that?

A. Correct.

Q. That never–you didn't know he paid any tuition for you?

A. Huh-uh.

Q. Didn't know that he ever paid any books for you?

A. No.

Q. Never knew that he bought uniforms for you?

A. He didn't buy any uniforms, no.

Q. Didn't know that he built this garage for you?

A. He didn't build the garage for me.

Q. Well, for on your property?

A. For his son.

Q. All right. Lived in a house rent free for three years?

A. No, two.

Q. Two years?

A. Uh-huh.

Q. I mean, all this as far as you were concerned was gifts?

A. Yes.
. . .

A. He told [Husband] that [the garage] was a gift. It was his early inheritance.

Husband's father testified that over the years he would pay Husband's and Wife's medical bills and car payments. When asked whether he ever considered these monetary advances to be gifts, Husband's father testified:

A. Nobody ever asked me to give them anything.

Q. All right. Now [Husband and Wife] never signed a note to you, I understand that.

A. No, they wasn't–I didn't think I needed one from my kids.

In addition to admitting that there never existed a signed document memorializing the asserted loans Husband's father made to Husband and Wife, Husband's father admitted that over the course of 15 years there was never an agreement as to repayment terms:

Q. Okay. When [Husband] come [sic] and borrowed that money from you, when did he tell you'd [sic] he pay you back because it's been 15 years?

A. When–when did he tell me he'd pay it back?

Q. Yes.

A. There was no specific time frame put on it.

Q. There's no time frame at all?

A. No time frame was put on it.

Though Husband's father testified that he had all of the cancelled checks to prove his alleged loans to Husband and Wife, Husband concedes in his reply brief that there were no exhibits made of any checks or any other documentation of amounts loaned. Furthermore, Husband testified that any proof of money owed to his father, such as copies of cancelled checks, was not submitted in discovery:

Q. Okay. And did you provide any of the cancelled checks in the interrogatories?

A. Not in the interrogatories, I didn't.

Q. Okay. And can you tell me your–this is money that you say you owe your father. There's no notes. You've provided us no notes and no checks; is that correct?

A. I can supply you the checks now.

Q. You didn't provide it to us in discovery, did you?

A. No.

Again, Husband concedes that there existed no legal debt that his father could recover in court against him and Wife. Instead, Husband argues on appeal that any money owed to his father is marital debt subject to division and that Wife should pay this debt because her income is greater than his. We disagree.

Husband correctly states that marital debts are "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). However, we cannot reach the question of whether any amounts owed to Husband's father are marital debts because the record contains scant proof that these monies were meant to be repaid at all. Faced with the lack of documentation for the asserted debt owed to Husband's father and conflicting testimony that amounted to "he said vs. she said," the trial court would have had to speculate to determine the amount owed to Husband's father and by whom.

The evidence does not preponderate against the trial court's finding that there is no debt owed to Husband's father. We therefore affirm.

## II.

Basing its decision upon a two-day trial, the testimony of witnesses and argument of counsel, and the record as a whole, the trial court designated Wife as Blaine and Blake's primary residential parent. Because decisions regarding parental responsibility often hinge on the parties' credibility, we are reluctant to second-guess a trial judge who has observed the witnesses and assessed their credibility before making such decisions. *See Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). As noted above, we review issues of parenting time and primary residential parent status for abuse of discretion.

In any action for divorce involving a minor child, the trial court must incorporate into its final decree a permanent parenting plan. Tenn. Code Ann. § 36-6-404(a). A permanent parenting plan is a "written plan for the parenting and best interests of the child, including

the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support . . . ." Tenn. Code Ann. § 36-6-402(3). In making its decision about a permanent parenting plan, the trial court must consider the factors set out in Tenn. Code Ann. § 36-6-404(b):

> (1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;
>
> (2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;
>
> (3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;
>
> (4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;
>
> (5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
>
> (6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
>
> (7) The love, affection, and emotional ties existing between each parent and the child;
>
> (8) The emotional needs and developmental level of the child;
>
> (9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;
>
> (10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

The primary concern in determining residential placement is the best interests of the child. Tenn. Code Ann. § 36-6-401(a). While the trial court is obligated to consider all of the relevant factors in reaching its decision, it is not required to explicitly list each of those factors nor its conclusion as to how a factor affected the overall determination. *See Hunsinger v. Hunsinger*, No. M2008-02434-COA-R3-CV, 2009 WL 4931345, at *4 (Tenn. Ct. App. Dec. 21, 2009); *Coley v. Coley,* No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *6 (Tenn. Ct. App. Dec. 12, 2008).

On appeal, Husband asserts that, based upon the statutory factors,[3] he should be designated the primary residential parent and "that the evidence preponderates against the trial court's factual conclusion that [Wife] is the comparatively better-fit custodian for the minor children." We disagree. Following our study of the entire record, we first note that there is no dispute that Blaine and Blake are close to Husband's side of the family, having

---

[3] Husband erroneously relies on the factors set forth in Tenn. Code Ann. § 36-6-106(a) rather than those found in section 36-6-404(b). *See Bryant v. Bryant,* No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at *5 (Tenn. Ct. App. Sept. 16, 2008) ("[T]he issues concerning the primary residential parent and the parenting plan are controlled by Tenn. Code Ann. § 36-6-404, not Tenn. Code Ann. § 36-6-106."). However, "[t]here is little substantive difference between the factors applicable to parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36-6-106(a), as far as determining comparative fitness and the best interests of the child." *Dillard v. Dillard,* No. M2007-00215-COA-R3-CV, 2008 WL 2229523, at *6 n. 5 (Tenn. Ct. App. May 29, 2008).

grown up on their grandparents' farm in Warren County, Tennessee. The evidence indicates that Wife and Husband's mother took "greater responsibility for performing parenting responsibilities relating to the daily needs of the child[ren]." Tenn. Code Ann. § 36-6-404(b)(2). Husband's family played a more active role in Blaine and Blake's lives than Husband did himself. The children often spent days and nights at their grandparents' home, their grandmother cooked for them and made sure they were very involved in church activities, and their aunt took them to and from school. Blaine testified that mostly Wife would cook dinner at night. Because Husband does not earn an income, it is also undisputed that Wife is the family breadwinner. The evidence indicates that she has the better disposition to "provide the child[ren] with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-404(b)(5). However, as to Wife and Husband's level of involvement in their sons' upbringing, the trial court heard differing, and at times conflicting, versions of the facts.

What is very palpable from the record is that Husband's relationship with his children, especially Blaine, deteriorated from the time of his separation from Wife. On the night that the parties separated, Blaine got in the middle of Husband and Wife's altercation. Husband grabbed Blaine by the jaw and threw him to the ground. The children have been living in Cookeville, Tennessee, with Wife since the parties separated on April 23, 2009. Following the parties' separation, the trial court ordered Blaine and Husband to attend counseling. The counselor testified that when she "first met [Blaine], anxiety seemed to be a problem," that "[h]e felt like he couldn't breathe at times" and that "he related to me that while they lived with their father, the father had been physically abusive at times and he was having problems not wanting to be around his father." She further testified that "Blaine loves his father but is deeply fearful of him" and that the progress that Husband and Blaine had made through the counseling sessions was halted after Husband yelled, "son, you know I never laid a hand on you" during the last counseling session.[4] At least for Blaine, it is clear that the "love, affection, and emotional ties" are stronger with Wife than with Husband. Tenn. Code Ann. § 36-6-404(b)(7).

As to the primary residential parent issue, the counselor testified as follows:

Q. Now [Husband] has asked for the children to be with him and then to visit with their mother every other weekend. Do you think that would be in Blaine's best interest?

---

[4] The court specifically noted that Husband's repeated denial of what Blaine perceived happened on the night of the separation is unhelpful to any reconciliation between Blaine and Husband. Both the counselor and Blaine testified that Husband's apologizing for what happened on the night he and Wife separated would mean the world to Blaine.

A. It would not be in Blaine's best interest.

Blaine testified that he likes his school in Cookeville and that he earns good grades. Pursuant to Tenn. Code Ann. § 36-6-404(b)(14), the trial court considered Blaine's preference to live with his mother:

Q. Now, your mom lives in Cookeville; is that right?

A. Yes.

Q. And your dad lives here–

A. Uh-huh.

Q. In Warren County?

A. Yeah.

Q. And would you like to live with your mom or your dad?

A. My mom.

Q. And why is that?

A. I just like my mom better. She treats me better and stuff.

When asked about the telephone conversations that he has with Husband, Blaine stated that "it goes okay sometimes" but that Husband "brings up stuff about the past and stuff and I just get upset and stuff."

By his own testimony, Husband has "said a lot of things [he] shouldn't have said" to Blaine such as, "I'm getting ready to walk out of your life and never speak to you until you grow up and realize that I'm not the bad person. You will see the truth. I will guarantee it. Don't ever call me again."  Husband also admitted to punching holes in the walls and breaking a remote control out of frustration. Wife testified that these actions took place in front of the children.

After carefully considering the record and in light of the relevant factors set forth in Tenn. Code Ann. § 36-6-404(b), we conclude that the trial court did not abuse its discretion and that the preponderance of the evidence supports the trial court's decision.  Had the trial

court ordered primary residential placement with Husband, it would have been contrary to both the counselor's and Blaine's testimonies. Husband has failed to demonstrate how the trial court applied an incorrect legal standard or reached an illogical conclusion.

## III.

Decisions regarding the nature and amount of spousal support hinge upon the unique facts of each case and require careful consideration of the factors found at Tenn. Code Ann. § 36-5-121(i). *Oakes v. Oakes*, 235 S.W.3d 152, 160 (Tenn. Ct. App. 2007). Those factors are:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The real need of the disadvantaged spouse seeking the support is the most important consideration for the court, followed by the obligor spouse's ability to provide support. *See Id*. Husband argues that these two factors weigh heavily in favor of an alimony in futuro award to him, and he argues that the trial court abused its discretion by not ordering Wife to pay him alimony. We disagree and do not find Husband's arguments to be compelling. While Husband's income is limited to social security disability and Wife's gross income was found to be $43,151.04 per year, Husband's parents[5] help him to meet his need and Wife's ability to pay is limited because she must support Blaine and Blake. As primary residential parent, Wife is responsible for the vast majority of her sons' daily living expenses, health insurance, and any other uncovered costs. Husband acknowledges his parents' support and asserts that "there is no way that [he] can come close to approximate the marital standard of living on his income." While enabling the spouse with less income "to maintain the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Gonsewski*, 2011 WL 4116654, at *10 (citing *Kinard v. Kinard,* 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle. . . . " *Id.*

The trial court found no basis as required in Tenn. Code Ann. § 36-5-121 to warrant the award of alimony to Husband. Having thoroughly reviewed the record and the statutory factors, we are of the opinion that the trial court did not abuse its discretion in declining to award alimony to Husband. We accordingly affirm the judgment of the trial court.

Costs of appeal are assessed against Kevin Frank Ogle, the appellant.

_____
ANDY D. BENNETT, JUDGE

---

[5] Husband's father purchased the parties' marital home that the trial court ordered sold at auction.